J-A10028-25

2025 PA Super 165

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JOSEPH L. PERSICO :
:
Appellant : No. 2025 EDA 2024

Appeal from the Judgment of Sentence Entered February 27, 2024
In the Court of Common Pleas of Carbon County Criminal Division at
No(s): CP-13-CR-0000121-2020

BEFORE: PANELLA, P.J.E., BECK, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY BECK, J.: **FILED JULY 29, 2025**

Joseph L. Persico ("Persico") appeals from the judgment of sentence entered by the Carbon County Court of Common Pleas ("trial court") after a jury convicted him of homicide by vehicle while driving under the influence ("DUI"), homicide by vehicle, DUI – general impairment, DUI – highest rate of alcohol, driving the wrong way, reckless driving, involuntary manslaughter, simple assault, and recklessly endangering another person.[1] Persico challenges the denial of his motion to suppress the results of a hospital blood draw that occurred following a motor vehicle accident. He argues that the Commonwealth failed to establish that hospital personnel conducted the blood draw for independent medical purposes. Because we agree with Persico that

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 75 Pa.C.S. §§ 3735(a), 3732(a), 3802(a)(1), 3802(c), 3308(b), 3714(b), 3736(a); 18 Pa.C.S. §§ 2504(a), 2701(a)(1), 2705.

his blood draw was illegal, we vacate his judgment of sentence and remand this matter to the trial court.

**Facts and Procedural History**

We summarize the evidence presented at the suppression hearing as follows. On the night of November 6, 2018, at approximately 11:54 p.m., Trooper John P. Blaski of the Pennsylvania State Police ("PSP") received a call reporting a three-vehicle crash in the northbound lanes of Interstate 476 ("the Northeast Extension") near Parryville Borough, Carbon County. At 12:13 a.m., Trooper Blaski arrived at the scene where he observed a white Audi A4 ("Audi") facing the wrong direction (southbound) against the median barrier. Through his investigation of the accident, Trooper Blaski ascertained that the driver of the Audi had been driving southbound in the northbound lanes of the Northeast Extension when it struck, head-on, a green Honda Civic that was driven by Paul Gerrity ("Gerrity"). The impact caused Gerrity's vehicle to spin into a blue Toyota Corolla, which was operated by Pan Tso ("Tso"). Carbon County Deputy Coroner Robert Miller pronounced Gerrity dead at the scene; Tso received medical treatment for his injuries, but ultimately survived.

By the time Trooper Blaski had arrived at the scene, paramedics had already transported the driver of the Audi to Lehigh Valley Hospital – Cedar Crest ("LVHCC"). After running the license plate of the Audi through his computer and communicating with paramedics, Trooper Blaski was able to

verify that Persico had been the driver of that vehicle. Trooper Blaski remained at the scene until his shift ended at approximately 5:00 a.m.

Persico arrived at LVHCC at 12:32 a.m. Shortly after Persico's arrival, hospital personnel ordered several blood and urine tests, which included blood and urine tests for ethanol. Raymond Garcia ("Garcia") of the LVHCC laboratory drew Persico's blood at 1:01 a.m. Chain of custody documentation for Persico's blood draw indicated that the blood sample for his ethanol level was placed in grey-top vial and sent to the LVHCC toxicology laboratory at 1:28 a.m., where it was sealed and locked, remaining untested. The toxicology laboratory then sent this blood sample to secure storage at Health Network Laboratory ("HNL") at 4:10 a.m., where it was placed in long-term storage, again untested. In fact, at no point on the night of the accident did either LVHCC or HNL analyze Persico's blood to determine his blood alcohol content ("BAC").

As Trooper Blaski remained at the scene of the accident for the entire night, he never went to the hospital to speak with Persico or any medical personnel, and did not request a blood draw. Two other troopers went to the hospital, but those troopers were unable to speak with Persico as he underwent medical treatment. According to Trooper Blaski's testimony, to the best of his knowledge, neither of those two troopers requested that hospital personnel draw Persico's blood.

In the days following the crash, Trooper Blaski interviewed paramedics Jared Yeastedt ("Yeastedt"), Casey Rich ("Rich"), and Matthew Derkosh ("Derkosh"), each of whom treated Persico on the night of the crash. Yeastedt told Trooper Blaski that Persico was incoherent, dazed, and confused. Rich and Derkosh told Trooper Blaski that Persico could not remember anything about the crash or anything else that happened that night. Rich also informed Trooper Blaski that he smelled a faint odor of alcohol on Persico. Both Yeastedt and Derkosh, however, told Trooper Blaski that they did not smell alcohol on Persico.

On November 29, 2018, Corporal Matthew Hunter of the PSP was conducting a search pursuant to a warrant of Persico's Audi when he discovered a half-full 375-milliliter bottle of vodka in the passenger compartment. Consequently, on December 12, 2018, Trooper Blaski obtained two search warrants—one for HNL to analyze Persico's secured blood sample, and another to obtain Persico's medical records from LVHCC. On December 14, 2018, over a month after the accident, HNL analyzed Persico's blood sample and determined that his BAC was .22 at 1:01 a.m. on the night of crash.

On January 13, 2020, the Commonwealth filed a criminal information, in which it charged Persico with the aforementioned crimes. On October 29, 2020, Persico filed a pretrial motion to suppress the results of his blood draw. Persico alleged that his blood draw violated section 3755 of the Pennsylvania

Vehicle Code, 75 Pa.C.S. § 3755, and his rights under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. *See* Suppression Motion, 10/29/2020, ¶¶ 13-16; Brief in Support of Suppression Motion, 4/19/2021, at 12 (unpaginated). On March 2, 2021, the suppression court held a hearing on Persico's motion during which Trooper Blaski testified as the sole witness. At the conclusion of the hearing, the suppression court allowed the parties time to submit briefs in support of their respective arguments.

Ultimately, on June 29, 2021, the suppression court denied Persico's motion. The court concluded that because the hospital, as a private actor, drew Persico's blood on its own initiative and not at the request of police or any other government official, the blood draw did not implicate the Fourth Amendment to the United States Constitution or Article I, Section 8 of the Pennsylvania Constitution. Suppression Court Order, 6/29/2021, at 10. The suppression court further found that Persico's blood draw did not implicate section 3755 because there was no evidence to suggest that the hospital drew the blood for any reason other than independent medical purposes. *Id.*

A jury convicted Persico on October 18, 2023. On February 27, 2024, the trial court sentenced Persico to an aggregate term of three to six years in prison. Persico filed timely post-sentence motions that the trial court subsequently denied. Persico then timely appealed to this Court. He presents the following issue for review:

1. Did the trial court err in failing to suppress the blood sample taken from [Persico] and all medical records containing the results of chemical blood testing of the blood sample, which constituted fruit of the poisonous tree, where the search and seizure of [Persico]'s blood sample was performed without a search warrant, probable cause, or the consent of [Persico] in violation of the United States and Pennsylvania Constitutions?

> a. Did the trial court err in failing to suppress an illegally obtained blood sample and chemical blood test results, contained in the records and report generated by [HNL], where the Commonwealth failed to sustain its burden of proof at the suppression hearing by failing to establish that the blood draw was solely for medical purposes or in compliance with 75 Pa.C.S. [§] 3755?

Persico's Brief at 3.

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre[]trial motion to suppress.

***Commonwealth v. Carey***, 249 A.3d 1217, 1223 (Pa. Super. 2021) (citation

omitted).

### Persico's Arguments

Persico argues that his blood draw violated his rights under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, and the trial court therefore erred in denying his motion to suppress the results of the blood draw.  *See* Persico's Brief at 14-35.  Specifically, he contends that there was no evidence to support the trial court's conclusion that hospital personnel drew his blood for independent medical purposes.  *Id.* at 30-34.  Rather, Persico maintains that all the evidence the Commonwealth presented demonstrates that hospital personnel conducted the blood draw for criminal prosecution purposes.  *Id.* at 32.  Thus, he asserts that hospital personnel conducted the blood draw pursuant to section 3755, but the Commonwealth failed to establish there was probable cause to believe that he had operated a vehicle under the influence of alcohol or a controlled substance such that a blood draw under section 3755 was permissible.  *Id.* at 32-33.  Finally, Persico argues that the search warrants Trooper Blaski later executed to obtain and test his blood sample did not cure the fact that the blood draw itself was illegal.  *Id.* at 34-35.

**Section 3755 and Constitutional Protections**

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from

- 7 -

unreasonable searches and seizures.[2] ***Int. of T.W.***, 261 A.3d 409, 416 (Pa. 2021). "It has long been established that a blood draw for purposes of determining BAC constitutes a search under the Fourth Amendment." ***Commonwealth v. Bell***, 211 A.3d 761, 769 (Pa. 2019). It is also well settled that "[a] search or seizure conducted without a warrant is presumptively unreasonable … subject to a few specifically established, well-delineated exceptions." ***Commonwealth v. Jones-Williams***, 279 A.3d 508, 515 (Pa. 2022) (quotation marks and citation omitted).

_____

[2] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, paper, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularity describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Article I, Section 8 of the Pennsylvania Constitution states:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizure, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8.

Previously, one such exception to the warrant requirement as it pertains to blood draws was section 3755 of the Vehicle Code,[3] which provided:

> If, as a result of a motor vehicle accident, the person who drove, operated or was in actual physical control of the movement of any involved motor vehicle requires medical treatment in an emergency room of a hospital and if probable cause exists to believe a violation of section 3802 (relating to driving under influence of alcohol or controlled substance) was involved, the emergency room physician or his designee shall promptly take blood samples from those persons and transmit them within 24 hours for testing to the Department of Health or a clinical laboratory licensed and approved by the Department of Health and specifically designated for this purpose. This section shall be applicable to all injured occupants who were capable of motor vehicle operation if the operator or person in actual physical control of the movement of the motor vehicle cannot be determined. Test results shall be released upon request of the person tested, his attorney, his physician or governmental officials or agencies.

75 Pa.C.S. § 3755(a). Section 3755 was part of Pennsylvania's statutory "implied consent" system that, which, together with section 1547 of the Vehicle Code[4] "comprise a statutory scheme which both implies the consent

---

[3] As discussed in greater detail infra, our Supreme Court held during the pendency of this appeal that section 3755 is unconstitutional. *See* **Commonwealth v. Hunte**, ___ A.3d ___, 2025 WL 1703981 (Pa. 2025).

[4] Section 1547, the implied consent provision, states:

> **(a) General rule.--**Any person who drives, operates or is in actual physical control of the movement of a vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual

*(Footnote Continued Next Page)*

of a driver to undergo blood testing in certain circumstances and requires hospital personnel to release the blood test results at the request of, among others, a police officer." **Commonwealth v. Shaw**, 770 A.2d 295, 298 (Pa. 2001).

Our Supreme Court has explained that section 3755(a) required "hospital personnel, in cases where probable cause exists to believe that an emergency room patient has violated Pennsylvania's DUI statute, to take blood samples for BAC testing." **Id.** There was no requirement in the statute, however, "that the BAC testing be conducted at the request of a police officer." **Id.** The only condition for a legal blood draw under section 3755 was "the abstract requirement that probable cause exists to believe" there was a violation of the DUI statute. **Id.** Where such probable cause existed, section 3755 required hospital personnel to take blood samples for BAC testing. **Id.**

_____

physical control of the movement of a vehicle in violation of section 1543(b)(1.1) (relating to driving while operating privilege is suspended or revoked), 3802 (relating to driving under influence of alcohol or controlled substance) or 3808(a)(2) (relating to illegally operating a motor vehicle not equipped with ignition interlock).

**(b) Civil penalties for refusal.--**

(1) If any person placed under arrest for a violation of section 3802 is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person[.]

75 Pa.C.S. § 1547(a), (b)(1).

The Supreme Court also noted that section 3755 was "inartfully drafted" because it "required a probable cause determination without specifying who is to make such determination, or how such an abstract requirement is to be met." *Id.* n.3. The Court suggested that either police or "hospital personnel familiar with [s]ection 3755(a)" could make the probable cause determination. *Id.*

In **Shaw**, "it was undisputed that [the appellant]'s BAC test was conducted for independent medical purposes[,]" as "[t]here was no request by [police] that a BAC test be performed, nor did hospital personnel perform the BAC test as a result of any perceived duty arising out of the abstract probable cause requirement in [s]ection 3755." *Id.* at 298-99. Our Supreme Court held that, where hospital personnel conduct a BAC test for independent medical purposes, i.e., not at the request of law enforcement, the blood test did not occur pursuant to section 3755. *Id.* at 299. As such, the Court explained, police are not statutorily authorized to obtain the results of the blood test without a warrant and thus, the release of the results would violate Article I, Section 8. *Id.*

More recently, our Supreme Court held that in conducting a blood draw, as opposed to a blood test, if there is no evidence that hospital personnel acted at the direction of police or as an agent of the police, and instead, conducted the blood draw for "independent medical purposes," the blood draw did not occur pursuant to section 3755 and likewise, did not trigger the

protections of the Fourth Amendment to the United States Constitution or Article I, Section 8 of the Pennsylvania Constitution. *Jones-Williams*, 279 A.3d at 515, 519-21. In *Jones-Williams*, the hospital conducted a blood draw on Jones-Williams shortly after his arrival following a motor vehicle accident. *Id.* at 511. A little over an hour later, a police officer arrived at the hospital and completed paperwork to have a hospital transfer the blood sample to a laboratory accredited for BAC testing. The Supreme Court determined that the blood draw did not implicate section 3755. *Id.* at 520. The Court explained that the record was silent as to why hospital personnel drew Jones-Williams' blood prior to the arrival of police at the hospital, but ultimately determined that the blood draw, and the subsequent blood test, did not occur pursuant to section 3755 because the paperwork police used to request the testing of the blood sample stated that it was requesting the test in accordance with section 1547. *Id.*

Recently, however, as noted above, our Supreme Court ruled that section 3755 is facially unconstitutional. *See Commonwealth v. Hunte*, ___ A.3d ___, 2025 WL 1703981 (Pa. 2025). In *Hunte*, the defendant was the driver in a single-car accident that resulted in the death of his vehicle's passenger. *Id.* at *3. Following his transport to the hospital, the PSP trooper who was with the defendant was unable to obtain his consent to a blood draw because he was unconscious. *Id.* The trooper therefore requested that hospital personnel draw the defendant's blood pursuant to section 3755, and

- 12 -

they complied without the defendant's knowledge or consent, and without the trooper first obtaining a warrant for the blood draw. *Id.* The PSP later obtained search warrants to take possession of the defendant's blood sample and to have a laboratory test the sample to determine the defendant's BAC. *Id.* at *4. Analysis of the defendant's blood revealed the presence of alcohol and controlled substances. *Id.*

The defendant was charged with homicide by vehicle while DUI and related offenses. *Id.* He filed a motion seeking to suppress the results of the blood draw on the basis that section 3755 was unconstitutional. *Id.* The trial court granted the defendant's suppression motion and found section 3755 unconstitutional. *Id.* at *5. Because of "the trial court's declaration that a statute of this Commonwealth is unconstitutional," our Supreme Court exercised "direct appellate jurisdiction under [s]ection 722(7) of the Judicial Code." *Id.*; *see also* 42 Pa.C.S. § 722(7).

In analyzing section 3755, the Supreme Court stated that "[o]n its face, [s]ection 3755 … purports to authorize the seizure of a person's blood on the basis of probable cause to suspect DUI, without the need for a search warrant or the demonstration of any circumstance-specific exception to the warrant requirements of the Fourth Amendment and Article I, Section 8." *Hunte*, 2025 WL 1703981 at *2. Thus, the Court explained, "[b]ecause [s]ection 3755 authorizes warrantless searches for an entire category of cases, its constitutionality under the Fourth Amendment is facially suspect." *Id.* at *9.

The Supreme Court examined whether blood draws in DUI cases fell under any exceptions to the warrant requirement. *See id.* at \*\*9-21. Relying on recent developments in Fourth Amendment case law, our Supreme Court determined that "statutory 'implied consent' cannot serve as an independent, categorical exception to the warrant requirement." *Id.* at \*16. Furthermore, the Court stated, "warrantless blood searches are not authorized by any categorical understanding of exigent circumstances." *Id.* The Court concluded that "neither the exigent circumstances doctrine nor consent— actual or 'implied'—provides the categorical authority" to excuse the warrant requirement when conducting a blood draw. *Id.* at \*23.

Therefore, the Supreme Court held that "[s]ection 3755 is clearly, plainly, palpably, and indeed, facially unconstitutional under the Fourth Amendment[,]" and, consequently, that it was also unconstitutional under Article I, Section 8 of the Pennsylvania Constitution. *Id.* at \*23. The *Hunte* Court reasoned that "[a] blood draw conducted under [s]ection 3755 … remains a warrantless search in search of an exception." *Id.* at \*16. The Court thus held that section 3755 concerns the seizure of blood from a DUI suspect, which constitutes a search under the Fourth Amendment, and that as such, blood draws require a warrant. *Id.* Accordingly, the Court concluded that "[s]ection 3755 purports to authorize warrantless searches of blood in the absence of any legitimate exception to the Fourth Amendment's warrant requirement." *Id.* Finally, with respect to the warrants law enforcement

procured to seize and analyze the defendant's blood sample, the Supreme Court determined that "[a] subsequently obtained search warrant does nothing to cure the statute's facial authorization of a warrantless search." *Id.* at *21.

## Independent Medical Purpose

As *Hunte* struck down section 3755 as unconstitutional, section 3755 cannot serve as a legal basis for the blood draw in this case, as there is no dispute that Persico's blood draw occurred without a warrant. *See id.* at *23. In light of the fact that hospital personnel drew his blood, the question remains whether Persico is entitled to constitutional protections against unreasonable search and seizure for the taking of his blood. *See Jones-Williams*, 279 A.3d at 515, 519-21; *see also Shaw*, 770 A.2d at 298-99. Together, *Shaw* and *Jones-Williams* instruct that where a hospital conducts a blood draw or a blood test for independent medical purposes, it is not acting pursuant to section 3755 and cannot be viewed as an instrument or agent of the government such that the constitutional protections provided by the Fourth Amendment and Article I, Section 8 apply. *See id.* Thus, to determine whether the blood draw in this case was legal, we must analyze whether the hospital conducted Persico's blood draw pursuant to section 3755 or for independent medical purposes. We therefore turn to two cases from this Court that have analyzed blood draws on DUI suspects and whether they were conducted for independent medical purposes.

In ***Commonwealth v. West***, 834 A.2d 625 (Pa. Super. 2003), the appellant was the operator of a vehicle that collided with and killed the occupants of another vehicle. ***Id.*** at 627. At the scene, West showed signs of intoxication and indicated that he had been consuming alcohol; consequently, police placed him under arrest for DUI. ***Id.*** Police accompanied him to Indiana Hospital for treatment for his injuries and while at the hospital, improperly informed him that if he did not consent to blood testing to determine his BAC, the hospital would still conduct the tests. ***Id.*** West then consented to a blood draw. ***Id.***

After this initial blood draw, representatives from the Indiana County District Attorney's Office arrived at the hospital and police informed them that they had given West inaccurate information regarding the consequences of refusing to consent to a blood draw. ***Id.*** at 628. While the representatives from the district attorney's office and police discussed the matter in a hospital hallway, an unidentified nurse informed them that the hospital was going to conduct a second blood draw. ***Id.*** This second blood draw occurred as hospital personnel were preparing West for transfer via Life Flight helicopter to Allegheny General Hospital and after they had formally discharged him from Indiana Hospital. ***Id.*** at 628, 635. Personnel at Allegheny General conducted a third blood draw upon West's arrival at that facility. ***Id.*** at 628. Police obtained a warrant for the results of each of the three blood draws. ***Id.***

- 16 -

Pursuant to West's suppression motion, the trial court suppressed the results of the first blood draw, but permitted the Commonwealth to introduce the results of the second and third blood draws. *Id.* Following trial, a jury convicted him of homicide by vehicle while DUI and several related offenses. *Id.* at 628-29. On appeal, West challenged the trial court's decision not to suppress the results of the second and third blood draws. *Id.* at 629. Beginning with the third blood draw, we concluded that the trial court did not err. *Id.* at 633-34. We reasoned: "It is undisputed that this draw was taken for independent medical purposes. No police officers or members of the Indiana County District Attorney's Office contacted anyone at Allegheny General to request this testing." *Id.* at 633.

With respect to the second blood draw, this Court determined that the trial court erred in failing to suppress the results of that blood test. *Id.* at 634. We explained that the second blood draw occurred at Indiana Hospital after West's discharge from that hospital. *Id.* at 635. Additionally, testimony from the suppression hearing suggested that the second blood draw only occurred after hospital personnel overheard law enforcement's concerns with the legality of the first blood draw and decided to arrange the second blood draw. *Id.* at 635-36. We further determined that the certified record contained no evidence that supported the Commonwealth's contention that hospital personnel conducted the second blood draw for independent medical purposes and thus, we reasoned that we could not "know for certain what

motivated him to order this test after [West] had already been discharged from the hospital's care." *Id.* at 636. Concluding that the Commonwealth failed to meet "its burden of proof and persuasion[,]" we explained:

> In light of the fact that [the appellant] had already been discharged from Indiana Hospital when the second blood draw occurred, a statement that the blood test was done for medical purposes does not suffice. The Commonwealth should have produced evidence showing what the "independent medical purpose" was, or evidence to prove that the blood was drawn pursuant to a "perceived duty" by Indiana Hospital arising out of [s]ection 3755. Without more, we cannot say the contested Indiana Hospital blood draw was in compliance with the law. As such, the trial court should have suppressed those results.

*Id.* at 637, 639 (citations omitted).[5]

An en banc panel of this Court later applied *West* in determining what evidence the Commonwealth must produce to establish that a blood draw occurred for independent medical purposes. *See Commonwealth v. Miller*, 996 A.2d 508 (Pa. Super. 2010) (en banc). In *Miller*, when police arrived at the scene of a single-car accident, they found Miller unconscious, detected a strong odor of alcohol on him, and observed a case of beer in his vehicle. *Id.* at 510. Following Miller's transport to the hospital, medical personnel conducted a blood draw, which revealed the presence of cocaine in his blood and a BAC of .22. *Id.* There was no dispute that the hospital drew and tested

---

[5] This Court ultimately found that the trial court's failure to suppress the results of the second blood draw was harmless error based upon the trial court's proper admission of the results of the third blood draw. *West*, 834 A.2d at 634-38.

Miller's blood for independent medical purposes. *Id.* at 515. Police obtained a warrant for the results of the toxicology screen and the Commonwealth later charged the defendant with DUI and related offenses. *Id.* at 510. Miller filed a motion to suppress the results of his blood draw, which the trial court granted, concluding that the Commonwealth failed to present evidence of the reason why the hospital conducted the blood draw. *Id.* at 510-11.

On appeal, an en banc panel of this Court reversed the order granting suppression. *Id.* at 515-16. We emphasized that "where a blood draw is conducted for medical purposes, and the results of the blood test are obtained after proper execution of a search warrant, the results of the blood draw are admissible in the prosecution of a DUI defendant." *Id.* at 513. Additionally, relying on *West*, we explained:

> The circumstances of the present case are most like the third blood draw in *West*, where hospital personnel independently did a blood draw. There was no evidence to suggest [Miller]'s blood draw had been taken for any reason other than independent medical purposes. Absent more, the Commonwealth had no obligation to prove the sample was taken for independent medical purposes. The police obtained a valid warrant for the results of [the defendant]'s blood test. Because the blood draw was conducted for independent medical purposes, and [police] obtained the results of this blood draw after applying for and executing a valid search warrant, the court should not have suppressed the BAC test results.

*Id.* at 515.

This Court also distinguished the blood draw in *Miller* from the second blood draw in *West*. *Id.* We reasoned that, with respect to the second blood draw in *West*, there were several questions as to the motivations underlying

that blood draw, but there was no suggestion that the blood draw in *Miller* occurred for any reason other than independent medical purposes. *Id.* Thus, we concluded that "the Commonwealth had no need to produce additional evidence of the specific independent medical purpose for [Miller]'s blood tests." *Id.*

## Analysis

With this authority in mind, we turn our attention to the facts of this case. The record reflects that following the crash, Persico arrived at LVHCC at 12:32 a.m., and that shortly after his arrival, hospital personnel ordered several blood tests, which included a test for Persico's BAC. N.T., 3/2/2021, Exhibit C-5. The record further reflects that Garcia drew Persico's blood at 1:01 a.m., and that hospital personnel completed a "Chain-of-Custody" form for a grey-top vial of his blood that HNL would later use to determine his BAC. *Id.*, Exhibit C-4 (Chain of Custody Form). This form indicated that at 1:28 a.m., Persico's blood sample was locked in the LVHCC toxicology laboratory, and that LVHCC then sent the sample to secure storage at HNL at 4:10 a.m. *Id.* At no point on the night of the accident was the grey-top vial analyzed nor was Persico's BAC determined. On December 12, 2018, Trooper Blaski obtained a search warrant for HNL to analyze Persico's blood sample, and on December 14, 2018, HNL determined Persico's BAC was .22 at 1:01 a.m. on the night of crash more than a month earlier. *Id.*, Exhibits C-2, C-4 (HNL Laboratory Analysis Form).

Upon the filing of a motion to suppress evidence, the Commonwealth bears both the burden of production and the burden of persuasion that law enforcement did not unlawfully seize the evidence in question. *Commonwealth v. Price*, 284 A.3d 165, 168 (Pa. 2022); *see also* Pa.R.Crim.P. 581(H). Although we acknowledge that the *Miller* Court held that the Commonwealth has no obligation to prove a blood sample was taken for independent medical purposes where there is no evidence to suggest otherwise, here there existed ample evidence to suggest that the blood draw was not taken for independent medical purposes. *See Miller*, 996 A.2d at 515. The Commonwealth, however, did not present any evidence at the suppression hearing setting forth the hospital's reasons for conducting a blood draw, nor did any hospital personnel testify.

As our recitation of the record reflects, the grey-top vial containing Persico's blood remained in storage at HNL and was not tested for more than a month after the accident, and that testing did not occur until police obtained a warrant for the analysis of the blood sample and the results. N.T., 3/2/2021, Exhibits C-4, C-5. Thus, there can be no contention that the hospital utilized the blood drawn for medical purposes.

Further, the record reflects that LVHCC conducted a urine test to determine Persico's ethanol level at approximately the same time it conducted the blood draw at issue and that it received the results of the urine test at around 2:12 a.m. on the night of the accident. *See* N.T, 3/2/2021, Exhibit C-

- 21 -

5. Although the urine test was insufficient to support a charge of DUI or any DUI-related crimes,[6] it would have informed LVHCC of his ethanol level if it needed such information for medical purposes. This further underscores the notion that Persico's blood draw did not occur for independent medical purposes.

We therefore conclude that the blood draw in this case was distinguishable from **Miller** and the third blood draw in **West**, as, unlike this case, there was no factual basis to conclude in either of those cases that the blood draws in question occurred for anything other than independent medical purposes. **See Miller**, 996 A.2d at 515; **West**, 834 A.2d at 633-34. To the contrary, like the second blood draw in **West**, the evidence presented by Commonwealth at the suppression hearing suggests that Persico's blood draw occurred purely for law enforcement purposes.[7] **See West**, 834 A.2d at 636-39. As no hospital personnel testified at the suppression hearing and the Commonwealth presented no evidence that Persico's blood draw occurred for independent medical purposes, the Commonwealth entirely failed to meet its

---

[6] The DUI statute requires BAC to be determined by "blood or breath," and thus, for purposes of criminal prosecution, a urine sample cannot sustain a DUI or DUI-related conviction. **See** 75 Pa.C.S. § 3802.

[7] We emphasize that we are not bound by a suppression court's legal conclusions, nor are bound by a suppression court's factual findings where they are not supported by the record. **See Carey**, 249 A.3d at 1223.

burden of proof and persuasion to establish otherwise. *See Price*, 284 A.3d at 168; *see also West*, 834 A.2d at 639.

We acknowledge that in *Jones-Williams*, our High Court held that if there is no evidence that hospital personnel acted at the direction of police or as an agent of the police in conducting a blood draw, and instead, conducted the blood draw for "independent medical purposes," the blood draw did not occur pursuant to section 3755. *See Jones-Williams*, 279 A.3d at 515, 519-21. The *Shaw* Court, however, likewise made clear that a blood draw does not need to be conducted at the request of a police officer for section 3755 to be applicable, but need only occur because of a perceived duty arising out of section 3755. *See Shaw*, 770 A.2d at 298-99. While there is no evidence in this case that police directed LVHCC to draw Persico's blood, there is ample evidence that the hospital conducted the blood draw in this case pursuant to a perceived duty under section 3755.

As established above, the Commonwealth presented evidence that LVHCC drew Persico's blood, immediately locked a sample of it in a grey-top vial, did not analyze it to determine his BAC, and instead sent the sample to HNL where it remained in storage until Trooper Blaski obtained a warrant over a month later to have HNL test the sample to determine Persico's BAC. *See* N.T, 3/2/2021, Exhibits C-2, C-4. No evidence of record indicates that LVHCC drew Persico's blood for independent medical purposes and all the evidence

reflects that the blood draw occurred pursuant to the hospital's perceived duty under section 3755.

Based on the foregoing, the blood draw violated Persico's rights under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution and the trial court erred in denying his motion to suppress the results of his blood draw. The subsequent search warrants that permitted the seizure of Persico's blood sample for testing did not cure the defect of the illegal blood draw. *See Hunte*, 2025 WL 1703981 at *21. We therefore vacate Persico's judgment of sentence and remand this matter to the trial court for proceedings consistent with this decision.

Judgment of sentence vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/29/2025